Call the next case. Case number 12-5263-1265 We call in case number 13-6217 USA v. Russell Collins Eddie Wilburn and Richard Brosky Your argument is to be 30 minutes of body-filing and 10 minutes of burning of the privilege of an officer of law from the U.S. Office of Justice. Good morning. You may proceed. Good morning, Your Honor. May it please the Court. My name is Travis Rossman. I represent appellant Russell Lee Collins. I'd like to reserve 3 minutes for rebuttal. The first issue I'd like to discuss is the admission of Russell Lee Collins' prior conviction for giving an officer a false name. This was a stale conviction. It was 15 years old at the time of trial, and so it fell under Rule 609B. The first error that the District Court made in admitting this prior conviction to impeach Mr. Collins was that the United States did not give the advance written notice required by the Rule. On Day 5 of the trial, the United States rested and Collins announced an intention to testify in his own defense. The United States had failed to file the notice, and the prosecutor said that he did not file it because he did not believe that the defendant would testify. The District Court stated a defendant always has the right to testify, and until he doesn't, you should assume that he will. And the District Court didn't find that mitigating at all. But the District Court said, well, we're going to allow this anyway because Mr. Collins had notice of his criminal history. He knew about his criminal history. There was nothing unfair or prejudicial. He knew this prior conviction was out there. And I think a defendant always has notice of his prior criminal history. I can't imagine a situation where a defendant would not have notice. I don't know if a defendant has to stand up and say, oops, I forgot about that one, but he did not have the notice required by the rule. It's his lawyer that often doesn't have notice. That's true, Your Honor, and that's very important for trial preparation. It's important for discussing whether the defendant will testify, how he will testify, and it's very important for making strategic decisions at trial. Collins was deprived of that opportunity by the United States failure. There's a prior case from this circuit, United States v. Sloman. It's a 1990 case. It's cited in the briefs, and in that case, the prosecution failed to file written notice, and the District Court allowed the evidence anyway, and this Court affirmed. Sloman's a little distinguishable on several grounds. First of all, the prior conviction sought to be admitted in that case was very similar to the offense conduct. The prior conviction was for transportation of stolen vehicles when the defendant ran a body shot, and the charged conduct related to a fraudulent insurance scheme to essentially steal a boat. Here, by contrast, the offense conduct was totally unrelated to the prior conviction. Giving an officer a false name is a Class B misdemeanor under Kentucky law, and it has nothing to do with manufacturing methamphetamine. I don't think anyone would say, well, you've given an officer a false name, so you have a propensity or a pattern of manufacturing methamphetamine. But if he's testifying, it does have something to do with his propensity for truth-telling. It does, Your Honor. He lied to a policeman. That's correct, Your Honor. He did lie to a policeman, and the District Court was required to balance the probative value and the prejudicial effect of that, and the District Court applied the wrong legal test. And I think that's very important. Under the rule, the District Court has to find that the probative value of the prior conviction substantially outweighs its prejudicial effect. That's required under Rule 609. The District Court flipped that test on its head, and it applied the Rule 403 analysis, which is whether the probative value is substantially outweighed by the prejudicial effect. So the District Court flipped the test and applied the wrong legal test. And we believe that whenever the District Court applies the wrong legal test, it's always an abuse of discretion. And analyzing that under the Sloman factors... And we have to always look to whether there was prejudice resulting therefrom. That's correct, Your Honor. So, was there? There was, Your Honor. Under the Sloman factors, which is what the Court looks to to determine whether there was prejudice, there was a high degree of prejudice by the District Court's mistake. First of all, the impeachment value of the prior crime was low. It was a Class B misdemeanor, giving an officer a false name. It's not a grave offense. And it's also unrelated to manufacturing methamphetamine. We also consider the point in time of the prior conviction and the witness's subsequent history. The prior conviction was 15 years old at the time of trial. It's a very old conviction. This Court has held that stale convictions over 10 years old are admissible only in rare circumstances. And this was not one of those rare circumstances. Analyzing his subsequent history, he had no subsequent conviction for a crime of dishonesty. So it's not like he was going out and defrauding people four or five times and then he's charged with fraud a sixth time and we have a clear pattern. This was an old isolated conviction. I've already talked some about the similarity of the past crime and the charged crime. Again, they're totally unrelated. But if the evidence of his guilt is otherwise overwhelming, isn't the admission or the cross-examination with respect to this earlier crime, can it not be harmless? In theory, it could. But I don't think here that there's overwhelming evidence. Credibility was key here. This was really a case all about credibility. Judge Daughtry makes the point about the importance of talking about that conviction or why it could be relevant about the giving of the false name if it all turned on credibility. Your client's the guy who lied to cops. Right. But under the Sloman factors, again, for the reasons I've discussed, the dissimilarity of the prior offense, its age, the district of court applying the wrong legal test, it shouldn't have come in. This is a case where there was very little physical evidence. There were materials related to the manufacture of methamphetamine found out in the field. There was no controlled buy involving my client. There was no physical evidence found in his residence. It was just a series of cooperating witnesses who came in and said, he sold me methamphetamine. He takes the stand and he says, I did not do it. So credibility is central here. That's where the prejudice comes from. From admitting this stale conviction under the wrong legal test. Again, I think Sloman is distinguishable. The district court, there was repeated reference to the prior conviction here. There was extensive examination about it. The prosecutor referenced it in his closing argument. The district court gave an instruction about the use of this evidence. In Sloman, there was just one brief mention of the prior conviction. So that's another distinguishing factor. It's also important to notice here that the district court did not apply the Sloman factors. The district court never analyzed these five factors. Not audibly. Well certainly, not on the record. Instead it applied the wrong legal test, excused the notice and never made findings on the record about those factors. The next issue I'd like to discuss is the United States deficient Rule 16 expert witness disclosures. The Friday before trial, the United States filed its expert witness disclosures under Federal Rule of Criminal Procedure 16. If I was Monday, I'd take it. It was Tuesday. Monday was a holiday. It was Memorial Day. So the Friday before trial, the United States filed these disclosures. The defendants had requested this information 14 months before. The United States files it on a Friday afternoon at 2 o'clock. The prosecutor says, I forgot and a colleague had to remind me. Trial starts Tuesday. The defendants raise it. From the United States v. Davis case, we have three factors in analyzing whether this evidence should have been excluded. The reason for the delay, the degree of prejudice, and whether prejudice could be cured with a less severe action than exclusion. I've already talked some about the reason for the delay. The United States supplemented its disclosures on Day 2 and the experts testified on Day 5. The degree of prejudice was very high here. The defendants had no meaningful opportunity to hire rebuttal witnesses or to examine the opinions and consult with experts. Is there anything in the record that shows what a responding expert might have testified to if you had time to get? I believe there is, Your Honor. There was extensive reference to the Iowa study for the methamphetamine conversion ratio. So these experts at trial testified that the conversion ratio from pseudoephedrine to methamphetamine, which was necessary to establish to make the Apprendi finding of 500 grams, was anywhere from 50% to 75%. On cross-examination, one defense attorney said, well, isn't there this study out here that says it's really 17%? And the expert says, I think he said, yes, I think I've heard of that or something. So the defendants could have had more opportunity to develop that had the United States properly filed its disclosures under Rule 16. I see your light is on. May I just ask whether or not my understanding was the court gave defense counsel the opportunity to file briefs or file requests for including continuance. That's correct. And nothing was done. That's correct, Your Honor. The defense counsel could have moved for continuance, but at that point the defendants had been in custody for quite a long time. They would have been prejudiced by continuance. That was the reason. I have it. Thank you. Thank you, Your Honor. Good morning, Your Honors, and may it please the court, I'd like to reserve three of my minutes for rebuttal, if I may. All right. Thank you. Your Honors, the first issue I'd like to get into this morning is that Mr. Wilburn's case did not involve 500 grams of methamphetamine, and then if I have time, I'd like to get into the Confrontation Clause issue. So, the main piece of evidence that the government used at the time of trial was these meth check records and the 1,335 grams of Sudafed that they were able to obtain from those meth check records. And you just heard my co-counsel say that their expert witness testified initially that you could get 50 to 75 percent from the Sudafed, but there are studies out there that take it as low as 17 percent. Let's just take, for instance, let's take the 1,335 grams and put it at 50 percent, which is the conservative figure that they testified to, and I think what this court's case law says in terms of the side of caution when we're talking about drug quantities. So that takes us down to about 660, 670 grams of methamphetamine from that amount. The problem here is that that 1,335 isn't just this conspiracy. It also, as they admitted, involved the Smith conspiracy, which is a wholly separate case from this case. The Smith conspiracy went up on appeal before this court, and this court found that out of those meth check records, 550 grams was applicable to the Smith conspiracy. So I'm suggesting that if we're at 660 to start with and 550 of that is applicable to the Smith conspiracy, we're now down to 110 right there. Let's move on from that number and we have to talk about Mickey Brown and his estimates. And again, all of this has to be put into the context of my particular defendant in this case. Because Mr. Wilburn was in jail for years until June the 25th 2010. He was back in jail on a state detainer by February of 2011. So the scope of his conduct is different from the evidence that was presented at the trial in this case. The trial, even the meth check records, go far beyond the end of June 2010 to February 2011. But getting back to Mickey Brown, he says that between 2009 and April of 2011 he has these estimates of anywhere from 20 to 30 cooks, and I believe it was 16 to 34 grams that he testified to. You take the low numbers on each of those, the 16 grams times 20, and that's another 320 grams of methamphetamine. However, because you have to err on the side of caution. That goes back to Walton 1990's case. Erring on the side of caution, so we got that 320 grams now, right? The problem is that the hundred and some grams that we have left from the meth check records are subsumed by that 320 as well, because it's the pseudo-fed that they use from the cook with Mr. Brown. So you can't double count it. So it either counts under Mr. Brown, or it counts under the meth check records, but it doesn't count both ways. So that still leaves you with the 320 grams, and then you have to then go back and say, okay now, Mr. Brown... How much do you maintain that Mickey Brown, how many grams can he account for? He can account for that's all. But that's from a larger period than my defendant's involvement in the conspiracy, a much longer period. Limiting through his involvement. Correct. So I think that the numbers, you know, let's give him the benefit of the doubt and say it's two-thirds of that number. That still puts us at about 200 grams, which still is substantially below the 500 gram threshold that is needed for this conviction to be upheld. And the reason that it's so important in this case is that my client was labeled a career offender in this case. So the statutory maximums and minimums change, if they change down to a lower amount, because it's now between 50 and 500 instead of 500 and above, then the sentencing range drops dramatically. He goes from a 37 to a 34 even if the sentence is up to a 34, which takes him he was 360 to life and now he's down to 262 to 327. So we're talking about a drop of Wait a minute. Yes. Say that again. Sure. His sentencing range was 360 to life under the 500 grams or more. And if he goes from 37 to 34? He will be at 262 to 327. 262 327. And he received 360. All right. Thank you. And that's why it's really important in this case. I thought I saw something in the record about there being 1,335 grams of pseudofed which would translate into 1,001 grams of meth which if that were so, that would be 500 grams apiece for the two conspiracies. Let's go through that, Matt. So the 1,000 gram figure is if you take the high end. If you take 75%, that these guys were the best meth producers ever and that they could do the high yield every single time they did a cook, right? Which is, again, against the case law of the Sixth Circuit, but let's take that figure. So now we're at 1,000 grams. 1,001 I think it is. Right. So the Smith conspiracy was 550 grams out of that 1,001 that was attributed to the Smith conspiracy and that other appeal. So now that takes us to 451. So we're still below 500 no matter how you slice it, but I would submit that there's no way that they can even use 75 as the figure given that even their own expert testified it was 50 to 75%. And then take that number and you have to subtract back out the fact that my client didn't get involved in the conspiracy until at the earliest June 25, 2010 and was then arrested by February 2011 and the 450 figures even lower at that point. There's just no way that there's evidence to get up to 500 grams here. Let me stop you right there though. What does the case law say about overlapping conspiracies and being able to attribute evidence from one conspiracy to the other where some of the same people in both conspiracies or some of the predicate acts pertain to both conspiracies and that kind of thing. It's like you take a conspiracy, you find it when you join it and you might be subject to penalties for the ongoing criminal activity and some acts committed before you join. What's the case law on this? The case that I cited to is United States vs. Pruitt in my brief. And that's the one that says that you aren't held liable for those actions that occurred beforehand. And it makes sense because, and actually it's a 1998 case and I think your honor was either on that opinion or authored that opinion. And the reason for that is let's say it was a RICO conspiracy and let's say that there were 10 murders that occurred before a defendant ever joined the conspiracy. We don't say that he's criminally liable for those 10 murders if he joins five years down the road. And that's what this is here. This is the same exact thing as you can't be criminally reliable because you can't have the mens rea to buy into stuff that occurred far before you ever joined the conspiracy. And that's why the Pruitt case talks about 841A versus B versus C and how the low level dealers shouldn't be caught up in an 841B because the scope of their agreement was much less. What if the evidence shows that you knew about the criminal acts of the conspiracy prior to the time you joined it? I suppose if you knew and you affirmatively bought into them at that point, possibly if the evidence could show that. But the other thing is, the government has not even argued that position on this appeal. They've not relied on any of that argument whatsoever. The only argument they make in their brief is that the evidence can count up to 500 grams. They don't have any argument that my argument is wrong in terms of the scope of the conspiracy in this case. Let me ask you something. There was a jury in this case. Isn't the jury entitled to believe that there may have been as many as 30 cooks at 34 grams a cook? Couldn't they have believed that and found that there were somewhere over 1,000 grams? Here's the problem with jury making findings on these unlike drug quantities like this. They're not given any of either the case law or the statutes to be able to make that determination. In this case, we have clear Sixth Circuit and I see my time's up if I can finish my response to this. We have clear Sixth Circuit case law that says that when these guesstimates are being made, you have to err on the side of caution. This jury wasn't told that. There was nowhere in the jury instruction was the jury even told that... Maybe that's the problem. Because they are supposed to decide. They are supposed to decide but they're given the special verdict form and the little checks boxes, but they're not given any instruction on how they're supposed to do it. It's a nuanced point. If you had tried this case, you would have objected to that, wouldn't you? I'm never in the trial court. Was there requested jury instruction on that? No, there was not. I know your time's up. Yes. Let me ask you one more thing here. On the meth check records that were utilized with respect to the precursors to the meth and the admissibility of the meth check records, was that proper? Were those properly admitted in terms of using the police as the basis for the admission of those records together with the knowledge, with the record keeping of the company that kept the records? What was your position on the legality of that? Well, I think there are basic evidentiary problems with the admission of the records themselves. We also argue that there's a problem with the admission of the records themselves. We have basically their agent, O'Neill, talking about what these records were and what they meant when agent O'Neill had nothing to do with the preparation of those records, didn't know any of the factual determinations or factual facts that comprised those records, and yet he was the one that was able to introduce all of the details of those records. On top of that, you have the fact that these records were made for law enforcement and litigation purposes. They were made to be brought into court if need be. They were made for the very thing that happened in this case. Therefore, they were testimonial in nature, and the confrontation clause kicked in at this point. There's a real problem with the admission of these records, and the government argues that, well, there's harmless error even if these meth check records were improperly introduced, there's harmless error. We just got through talking 10 minutes on how they rely heavily on those meth check records to get to 500 grams. They're not harmless error. There's the issue of whether there were proper experts utilized for admission of the records, but then there's the additional issue of whether that violated the confrontation clause. Now, the confrontation clause issue aspect of the admission of those records preserved at trial for all three defendants. It's going to be a plain error review, but Menendez Diaz is directly on point with regards to the business exception rule and confrontation clause, and it certainly applies here. Thank you, Your Honor. Thank you. Thank you, Your Honor. May it please the court, Mark Wall on behalf of Mr. Richard Brodsky, and I haven't asked for any rebuttal time, Your Honor, and I've only asked for five minutes. As an old trial attorney, I try to get in and get out as quickly as I can, and as I stand here and listen to some of the questions today, I must honestly say, and I'm somewhat embarrassed to say, that I was one of the trial attorneys, but I will say to this panel that there are a lot of decisions that we make as attorneys that may not look as clean on the record, but those are all tactical decisions. And I want to address, if I might, Your Honor, briefly, what the court just asked about the... Are you throwing away any plain error review, saying we don't need to bother with that? No, no, no, no, Your Honor. I agree wholeheartedly in this case, and the real critical issue in this case is the way that these records came in. This is an important case. This case had been pending. We had asked for discovery 14 months earlier. We were in the last day of trial, and the last day of trial, Agent O'Neill comes in on that day and presents us with the meth check records. Their first witness in the case, the very start off witness, was Mr. Acquisto. Mr. Acquisto came in as the expert to introduce the business records, if they were business records, and at no time when he was there did he ever take the records that we got on the last day of trial and say, yeah, I've looked at those records, those records appear to be the types of records that we keep in normal course of business, and then introduce them. And then after he introduced them, then we would have been able to use them during trial. We go the whole trial, they put their witnesses on the stand, we don't have the records, the meth check records of the witnesses they put on there, and I know I, Mr. Goodman, I've known Mr. Goodman for a long time, and he does a very fine job, I've known him for years, but he says that I had an opportunity to confront two of the witnesses that were on the stand. Well, you know, you don't make the government's case for them as a defense attorney. I wasn't going to go in there and say, well, will you tell me how much methamphetamine or how much pseudofedrine you gave to these people? So there was a critical problem with it, and even if the court finds that they were admitted properly through Agent O'Neill, based on the underlying testimony of Mr. Acquisto, even if you find that, we still didn't have a chance to confront any of these witnesses. But they weren't admitted for proving the guilt or innocence of any particular individuals. But it was an important case. And they weren't created for this case. But it was critical, especially when you come down to the issue of how much pseudofedrine or how much methamphetamine was in this case. It was critical. For example... For confrontation clause purposes, it's also critical that they weren't created for use at trial and they weren't directed at any particular guilt or innocence of an individual. That's critical too, isn't it? I agree wholeheartedly, Your Honor. I'm not trying to argue against what  and I'm not trying to be a progeny. But what I'm saying is, as a trial attorney, when you're handed evidence on the very last day, it creates a problem for you because you really cannot confront their witnesses that were on the stand and say, well, how much of this pseudofedrine? I mean, they might have had an allergy. Quite candidly, I got an allergy and I might go out and buy 20... You'll be in meth check. And I'll be in meth check and I'll be in another case.  have a trial attorney at the last day resurrect the case and then it makes a decision, you have to make a determination, do you put your client on in your defense case, which in this case I did? I had no choice but to put Mr. Brosky on in my defense case because I had to explain away these records. What else do you do? So that created a problem for us in that regard too. How did you explain it away? I brought his mother in, or his grandmother in I brought his... He had an allergy? We talked about everything that went on in that household and maybe I didn't do the best job on it, your honor. Maybe luckily he had an allergy. The bigger problem is the genesis when it comes to Mr. Brosky, it's the genesis of this case in particular. The evidence on the hill, the evidence in the orchard, the evidence in the open field. I mean this case is akin to the old marijuana path cases that this court has written about many times over. We're going back to the revenuers. I guess maybe I'm older than you are. I came to the U.S. Attorney's office in 1990, your honor, and they had stopped doing the moonshine cases, but I got the marijuana path cases when I first started prosecuting. I prosecuted the last known revenuer case in Davidson County, Tennessee in about 1969. Interesting cases, and I've always said, your honor, that the young people today, the reason they don't do moonshine anymore is because it's too much work for them to carry the bags of sugar and the mash up the hill and it's easier to just put the marijuana plants in and use some powdered fertilizer. But this case is amazing because they go up and they find all this evidence. They claim it's evidence. They've got one container that apparently shows that it had ammonia in it. The rest of the containers that are up there, they just destroy them. They say, well, public safety. And I've got no argument with public safety with the container of ammonia. Destroy that. But what about the rest of it? And then you come back to the house, and there's no evidence found in Brodsky's house whatsoever. This was a field. This was at the top of a holler. When you go to the top of a holler, people come and go. It's no different than an apartment complex where you've got a trash container out back. This case should have been dismissed from the very outset because Mr. Brodsky never had a chance to look at that evidence, and I think it's clear the Supreme Court is clear on this issue. Now, Mr. Goodman argues that I didn't argue bad faith. I did argue bad faith. I argued bad faith twice, and then I argued it after the trial, after the conviction came in, and I think Judge Van Tatenhoff correctly said, Mr. Wolander, the third time is not a charm in this case, so you lose again. But, I mean, we shouldn't have even been sitting in this trial to begin with. Mr. Brodsky, from the very outset, didn't have a chance. But, Your Honor, I see my time is done, and again, I appreciate the Court, and unless there's any questions, I'll sit down. Thank you so much. May it please the Court. My name is Dan Goodman, with the United States Department of Justice. I would like to correct two things that Mr. Wilburn's counsel said     a trial, I would like to correct two things that Mr. Wilburn's counsel said under an 841 B1B case, Mr. Wilburn's statutory maximum would still be life imprisonment, because Mr. Wilburn had a prior felony drug conviction. Under 841 B1B, his statutory range with the prior felony drug conviction would still be ten years to life, and that life would be used for the career offender guideline. If, of course, the drug quantity doesn't matter for Mr. Brodsky, because the jury found that Mr. Brodsky had less than 50 grams, or was responsible for less than 50 grams of methamphetamine. So, even if this Court were to find an 841 B1B quantity, a lesser included offense, that would only affect the guidelines range of Mr. Collins. The second thing that I would like to correct with respect to Mr. Wilburn's testimony is Mickey Brown testified that he helped Collins and Wilburn cook meth 20 to 30 times in a seven-month period in 2010, cooking between 18 and 34 grams of meth each time. Does that account for the time that Mr. Shadd told us he wasn't around? The defense we were told about was that he couldn't count certain months. Right. I think both Mr. Collins and Mr. Wilburn were released from state custody in the early half of 2010. So, anything 2009 only can be directly attributable to Mr. Broski. Now, I'm not exactly clear whether that seven months includes any of the early months of 2010 that Mr. Wilburn was  That's not clear from the record. But what is also clear from the record is that in 2011, in February of 2011, agents came to Wilburn's house and did a search and found a one-step meth lab within Mr. Wilburn's trailer. So, meth was still being manufactured, apparently, in 2011, which was not among the seven-month period that Mr. Brown was testifying to. So there was additional evidence of additional meth manufacturing with respect to Mr. Wilburn, even going on into 2011. I think the jury could reasonably find, when Mr. Brown testified that he helped Collins and Wilburn cook meth 20 to 30 times in that seven-month period in 2010, cooking between 16 and 34 grams of meth each time, I think, construing the jury's verdict in the light most favorable to the government, that the jury could reasonably find, beyond a reasonable doubt, that it was more than the minimum of 320 grams. The problem, of course, is that we don't have other very specific testimony to add up to get over 500 grams, but we did have witness after witness testifying about small grams that can be added together that can help to boost the jury verdict. We had Brenda Elzip saying that she bought up to a gram of methamphetamine from Collins and Wilburn a couple of times each week. We have Kimberly Griffith. Wouldn't that have come from the amount that they were producing? I mean, you can't double-count, as Mr. Shadd pointed out. They've produced so much, they've cooked up so much, and people buy it. Well, that's a good point, Your Honor. We're talking about two conspiracies here, not counting the conspiracy to distribute to people under the age of 21. We're talking about a production conspiracy, and we're talking about a distribution conspiracy, and the figures are sort of mushed together in the record so that it's not always clear whether the 500 grams is being reached as a production figure or the 500 grams is being reached as a distribution figure. What is clear, of course, is that the production was presumably well in excess of 320 grams because the 320 grams, as I said, was that seven-month period and didn't account for the meth lab within the one-step meth lab within Mr. Wilburn's trailer. It did not account for the other people who were manufacturing meth with Wilburn and Collins, and other witnesses testified that Mr. Skaggs cooked meth with Wilburn and Collins. Mr. Broski cooked meth with Wilburn and Collins. There was certainly no evidence that said that Mr. Brown was there every single time that meth was cooked, so I think there is substantial evidence of cooking beyond whatever minimum amount we attribute to the cooking with Mr. Brown. Counsel, what about this claim that drug amounts from the Smith case conspiracy of being attributed to this case, and that that's an improper method of counting. What would you say about that issue? Well, Your Honor, that issue really goes to the 1335 grams and the pseudo-fedrin conversion to the methamphetamine. That was one additional indication of drug quantity that Agent O'Neill obtained and used to sort of bolster the quantitative rather than the qualitative evidence Frankly, I think the evidence is quite strong on the drug quantity wholly apart from the pseudo-fedrin evidence and that you really don't need that additional quantitative evidence. But the Smith conspiracy comes in only when you get to those pseudo-fedrin purchasers who were supplying both the Smith conspiracy and or the Collins-Wilburn-Brosky conspiracy. And the government certainly concedes that of the 1335 grams that some portion of that went to the Smith conspiracy and should not be attributed to the instant conspiracy. So we don't we acknowledge that and don't really think that that is a problem. We think that the evidence on the drug quantity is quite sufficient even if you totally disregard the pseudo-fedrin drug quantity testimony in its entirety. And you say you think it is quite sufficient by virtue of what testimony? By of the users? Well, first let's talk manufacturing. We're talking Brown. We're talking that Skaggs too testified he manufactured meth with Collins. We're talking that Brosky met with Collins and Wilburn. Then we're talking that in February 2011 the officers discovered the one-step meth lab that was active inside Wilburn's trailer. Then we have Adkins who was living with Wilburn in the late summer of 2010 and she said that she saw Collins, Wilburn, Brosky, Browns, and Skaggs cooking meth together. Adkins said that everyone was cooking meth when she lived with Wilburn. So there was a lot of cooking testimony. Then of course there was a lot of the purchase and distribution testimony. Basically Mr. Collins and Mr. Wilburn were completely self-supporting with their meth sales. Not only did they get the pseudoephedrine, but they got weapons, they got tools, they got a motor vehicle, they got sex, they got every basic need. But it's I think the jury could reasonably infer that for, especially with the evidence that there was always traffic in and out of the trailers where Mr. Wilburn and Mr. Collins lived, that it was a hectic drug scene, that there were at least 30 people selling pseudoephedrine to them in exchange for meth, but that other people known and unknown were also receiving meth. I think a jury could reasonably infer, at least with Wilburn and Collins, that the sales quantity was also in excess of 500 grams. I think that the fact that the jury attributed less than 50 grams to Mr. Broski is additional evidence that the jury was listening very carefully and doing its job and attributing amounts to each of the individual defendants according to the amounts that they felt was appropriate. Counsel, we've got a motion pending here to asking us to take judicial notice of the transcripts in the Smith case trial. Do you have any objection to that motion being granted? I have no objection, Your Honor. I would say that it really is not relevant or important to the legal issues, but if this court wants to take notice of the Smith transcripts, the government will not object to doing that. Okay. Could you address the issue of whether the meth check records were properly admitted in part through the testimony of the police officers and whether the proper foundation for the business records justified the admission or whether there was a confrontation clause problem with respect to the admission of those records? Yes, Your Honor. And just as a preface, again, I would say that that only goes to the pseudoephedrine calculations, which is not necessary to deciding the case, but I think that the district court did properly admit the records under Rule 803-6. In fact, the district court said... Well, I hate to interrupt you, but wasn't the jury given the cause to believe that those records were pertinent to the drug calculations? Oh, absolutely, Your Honor. The... I only raised that in connection with your comment that you know, those records are not necessary to decide the case. That was a way that the district court was able to come up with a more precise quantification of the drug production figure. Yes, Your Honor. And I do think that the district court properly admitted the records as business records under Rule 803-6. The court initially said that one thing we could do would be to recall Mr. Acquisto to testify about the records, but then the court correctly noted that because of Mr. Acquisto's prior foundational testimony about the way that the meth check records were kept, that those records, the specific records, could be introduced through the agents with Mr. Acquisto's testimony as the predicate testimony. Of course, the agents didn't have any knowledge of the records or whether the records were kept in the regular course of business or whether they were accurate or anything else. So what was the other basis that would justify the admission? Well, the... It was Mr. Acquisto of course who testified generally, not with respect to the specifics. Who was Mr. Acquisto? Mr. Acquisto was the records custodian for APRIS, which is the company that ran the meth check program in Kentucky, Your Honor. Okay, so he could only testify to the company's procedures and protocol in general in terms of those records. Right, but he was the records custodian as well, yes. So one of the arguments advanced by defense counsel is that the store clerks should have been called to introduce the  the store clerks really were not the appropriate people. All they knew is, you know, how the meth check records were kept, and certainly that Mr. Acquisto and probably that either of the agents who testified about them. The store clerks just processed the transactions for the over-the-counter medications for the Sudafed and the like, and probably did not remember years later which individuals had come in in which days and had purchased Sudafedrin. They probably just ran the check, saw the green light in effect saying, yes, it's okay, this person has not exceeded his limit for Sudafedrin purchases during the relevant time period. It's okay for me to go ahead and complete the sales transaction, which of course goes to the confrontation clause issue in terms of what the purpose of the meth check records was essentially to prevent people from purchasing too much Sudafedrin. If somebody has already purchased his allocation of Sudafedrin for the time period, then you get a red light. The purchase cannot be completed. That is not designed primarily for use as testimony against any particular defendant or certainly these defendants. It's sort of like a red light traffic signal. You might have a camera. If you run the red light, you might be subject to at least motor vehicle violations. The purpose of the red light is to get you to stop. The purpose of the meth check records is to prevent the other meth precursors to customers who are trying to purchase too much. Let me ask you this. Were some of the precursor records that were used in this case also used in the Smith case trial for purposes of calculating drug amounts? Your Honor, because it is not part of the record in this case until just now, I'm not familiar with the Smith trial. That's the inference I'm getting, but I cannot honestly answer that one way or the other for sure. Well, we find that to be the case that those records were used in both cases. Can the same amounts, records pertaining to the same amounts, be used in both cases with both with reference to both conspiracies? Is there any legal problem in that in the case law? My understanding, Your Honor, is that the Smith conspiracy was sort of a rival methamphetamine manufacturing and distribution group from the conspiracy that's at issue at this case. And so... Wasn't there some overlap? Did people know each other? Certainly there were some people that were involved in both, but I don't think any amounts that are attributable in terms of pseudoephedrine purchases that are attributable to the Smiths. Those amounts were also attributable to these three defendants who are before us on appeal today to Mr. Wilburn and Mr. Collins and Mr. Brodsky. But there was overlap in terms of people who were supplying pseudoephedrine to the Smiths and to these defendants. But it was not charged as one overlapping conspiracy. It was charged separately as two completely distinct cases, Your Honor. Just jumping to another issue, let me just ask you if you know... What was the reason that these experts that the government used were only revealed five days prior to trial? What was the government's reason for that delay? The reason which was regrettable but candid, the prosecutor said he simply forgot. He forgot something that important? Apparently so, Your Honor. To the crux of proving the case, he just forgot? That's what the record reveals and while obviously that's not an ideal situation for the government to be in. To his credit, he did not try to make excuses. He did not try to slough over that fact. At least it is evidence that it was not in bad faith or deliberate. It's embarrassing, certainly, but it was not in bad faith. I would certainly say that Mr. Collins, who raised that issue, was not prejudiced by the delay. Collins, as attorney and defense counsel, certainly effectively cross-examined Agent O'Neill. They brought out the fact that the conversion ratio could have been lower than 50%. Agent O'Neill said it could have been as low as 30% to 40%. Broski's attorney elicited that Agent O'Neill was not familiar with that Iowa study, which the court itself had brought up referencing the Bargo case. The expert testimony about conversion ratios not only was not crucial to the jury's drug quantity finding, but the tardy notice, the deficient notice, did not end up prejudicing the defendants. As you pointed out earlier, the defendants did not seek delay for further preparation or continuance, even though the district judge did offer them that opportunity. Nor, incidentally, is there any indication in the record that during the 14 months they were waiting for the government to respond, they reminded counsel, hey, we haven't received anything about the expert witnesses. The simple answer to your question is, I forgot. That was regrettable, but not in bad faith, Your Honor. There are a lot of other issues pending in the case, but unless there are any questions concerning those other issues, I'll rest for the remainder of my time. Forgive me if you've already addressed this, but the matter of the defendants who were in jail when the conspiracy started, and not wanting all of the acts to be attributable to them, do you have any case law that would shed any light on that issue? We are not pressing any argument that Mr. Collins or Mr. Wilburn, even though the indictment says that the conspiracy started, alleged that the conspiracy started in 2009, we are not trying to attribute to either Mr. Collins or Mr. Wilburn any drug quantity before they were released from prison in 2010. In that sense, it was only Mr. Brodsky who was not in prison of these three defendants in 2009. There was testimony that he was manufacturing methamphetamine with Joseph Orr, among others, in 2009. Incidentally, with respect to Mr. Brodsky's comments about the evidence that was found behind his orchard, behind his house in the Apple Orchard, there was not only a hydrous ammonia tank, but there were two other containers containing either very high or very low pH materials that were associated with methamphetamine, and there was also evidence connected back to Mr. Brodsky's house. The camera overlooking the Apple Orchard was hardwired to a camera in Mr. Brodsky's bedroom. We do think that evidence, which was 2009 evidence, and 2010 evidence, can be attributed to Mr. Brodsky, but for Mr. Collins and Mr. Wilburn, we are content to rest with the events of 2010 and early 2011, Your Honor. All right. Thank you. Thank you, Your Honor. The prosecutor forgot to file the Rule 16 disclosures, and he also forgot to give notice under Rule 609. The question is, who should bear the cost of his forgetfulness?  who was prejudiced through inability to prepare for trial completely, or should it be the United States in the form of a new trial? I think the answer is clear. I think the prejudice from both of these failures hindered Mr. Collins' trial preparation. He was surprised by the use of the prior conviction, and he had no meaningful opportunity to rebut the expert testimony about the conversion ratio, which was indispensable evidence in this case to convict him. There is no way to get from grams of Sudafedrin to grams of methamphetamine without a conversion ratio, and with that link missing, the United States could not prove its case beyond reasonable doubt. I don't know the answer, so I'm asking maybe everyone knows it. Isn't that sort of standardized, the conversion rate? No, Your Honor, I don't think it is. There was testimony at trial that it could be 17%, it could be 100%. Depending on equipment? Depending on what? Depending on ingredients, equipment, the skill of the cooks, a variety of factors. An expert is not someone who comes in to say these guys cooked really well, and their ratio is high. The expert is just saying, am I correct, typically the expert comes in and says it can be anywhere from here to here depending on how you cook. Right. How is that surprising? Is it surprising that there would be an expert, because you were crossing your fingers that you hadn't seen any evidence or notice of an expert, and maybe they don't have one? It's surprising in the sense that they could come in and testify to any ratio. We wouldn't know what their methodology is. We don't know what opinion they're going to express, and we don't have people or an opportunity to develop witnesses to come in and rebut that. It's just a total surprise. The next thing I would like to mention is the United States has apparently conceded that any drug transactions while Mr. Collins and the other defendants were in jail cannot be attributed to this conspiracy. Mr. Collins was in jail in all of 2009. He was released in early 2010. The United States admitted, or the district court admitted meth check records from all of 2009. All of these transactions from the Smith conspiracy and from 2009 came in. The jury saw that. It was material to the 1,355 grams of pseudofedrin and the meth quantity finding, and with that concession alone, I think at a minimum we should get a new trial or a judgment of acquittal based on the evidence being insufficient if those drug transactions cannot be attributed to the conspiracy. All right. Thank you. Thank you, Your Honor. You don't need to get much farther than the Smith decision itself, which is public record and which one of those courts unpublished decisions in this case that came out in November 2013. You don't even need to get into the Smith trial records to get to that far to show that, guess who was the expert witness in the Smith case? It was Agent O'Neill. And it says right in there that he used the same meth check records in both cases. And that trial was a couple months before the trial in this case. Yet in this case, he testifies and it gets out on cross-examination out of the 1,335 grams that you're talking about here, did you make any division between the Collins defendant conspiracy and the Smith conspiracy? No, I didn't. Did you make any breakdown in the calculations of when Mr. Wilburn was in jail? This is 4154 page ID. No, I didn't. So 4154, 4155, Agent O'Neill who's already testified in the Smith case admits that he didn't do any of those breakdowns, but just threw out that 1,335 for the jury to bite on in this case. And again, like I said to Judge Daughtry, the jury didn't even have any context in which to make those kind of reductions in its determination of the amount of drugs in this case. What they did with regard to Broski? Mr. Broski's evidence was a lot different than the evidence, because the evidence in... But it does somewhat belied, throw it up and see what sticks. But they weren't using, the meth check records against Broski at all. What they were using was, you know, there were separate cooks that were going on with Broski, but it was Wilburn and Collins that always went up the hill and or went up the hill with Brown and did these cooks. And that's where the meth check records come from. So it's a completely different thing. Just turning really quickly to Mr. Acquisto and why you can't rely on him in order to get these records in. He was never shown or identified any of the records. They didn't come in. They weren't even shown to him in trial. They didn't present until that last day of trial and then they came in through O'Neill. He can't have gotten those records in the door because he didn't even look at them or testify to them. Well, what was the nature of his testimony? His testimony was very brief. It was on May the 29th and it was just we keep these kinds of records. Generic, bland. It only matters when the testimony gets particularized to individuals. Like these records? Yeah, I mean they could have done something. And then at least there would have been several days notice that the records were there and existed. But they weren't because they didn't come in until the end.  absolutely no way they can get to 500 grams in this case. Thank you, Your Honors. Thank you. I guess that's it.